UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

Civil Action No. 3:16-cv-739

DENNIS YANCEY,

    Plaintiff,

v.

INGERSOLL-RAND COMPANY,

    Defendant.

# EXHIBIT 1

**(Notice of Removal)**

STATE OF NORTH CAROLINA    IN THE GENERAL COURT OF JUSTICE
                           SUPERIOR COURT DIVISION
MECKLENBURG COUNTY         CASE NO. 16-CVS-14838

DENNIS YANCEY,             )
                           )
        Plaintiff,         )
                           )    **COMPLAINT**
    v.                     )
                           )    **JURY TRIAL DEMANDED**
INGERSOLL-RAND COMPANY,    )
                           )
        Defendant.         )

## I. INTRODUCTION

Defendant Ingersoll-Rand Company (the "Company" or "Defendant") refused to allow Plaintiff Dennis Yancey ("Dennis" or "Plaintiff") to return to work from medical leave even after two psychologists had given him the green light. The Company only let him come back because he was a "lean, mean selling machine." Back at the office, Dennis's co-workers ridiculed him for his real or perceived disability. Someone put up a poster with his face on it with this disclaimer: "if you see this man, call security immediately." He was told that the Company installed bulletproof glass in a conference room just in case Dennis decided to "go off." Dennis reported this harassment and the Company responded that he should get "thicker skin."

This all stemmed from Dennis's complaints about the Company's handling of his health insurance, which interfered with his ability to obtain his needed ADHD medication. Sick and tired of being given the run around by the Company, Dennis said, I am "killing myself at work" for this Company. That is, he was giving the Company his all and it couldn't be bothered to help him get his medicine. From that point on, Dennis was a marked man. Exceedingly strong bias

and retaliatory intent crept in. He was singled out, and the Company went as far as to discredit the opinions of experts and rely on their own beliefs. It alleges that it fired Dennis after an employee complained about his behavior. Dennis was never made aware of this accusation, let alone given a verbal or written warning, or even interviewed as part of an investigation. Up to that point, Dennis was an exemplary performer with no prior discipline. Dennis did not change. Through illicit bias, the Company did.

Dennis now turns to this Court to hold the Company accountable for the harm and losses that he has suffered as a result of the Company's conduct. Specifically, Dennis brings claims against the Company for Wrongful Discharge in Violation of North Carolina Public Policy and under the Americans with Disabilities Act.

## II. PARTIES, JURISDICTION, AND VENUE

1. Plaintiff was a resident of York County while employed by the Company.

2. Defendant is a North Carolina Corporation that was doing business in North Carolina at all relevant times.

3. Plaintiff was hired to work for Defendant at its office located in Davidson, N.C. with their corporate office at 800-E Beaty Street, Davidson, N.C. 28036.

2. Plaintiff seeks damages in sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C.G.S. § 7A-243.

## III. FACTUAL STATEMENT

I. **General Background:**

3. Dennis suffers from Attention Deficit Hyperactivity Disorder ("ADHD"). This disorder began early in his childhood. His parents did not want his peers to mistreat him and they refused

2

to take him to a doctor for a proper diagnosis. It wasn't until 2008 that Dennis sought help. Dennis takes Vyvanse and Strattera to help combat focus, communication, and hyperactivity issues.

4. On or around April 2005, Dennis initially began working for the Company as a Sales Employee in Kansas City. Dennis grew his department from the ground up and turned an unprofitable division into a six million dollar department. He was responsible for the annual operating plan, budget, and asset management. Additionally, he managed several employees working under him. Dennis was also in charge of inventory and ensured that the department had everything necessary for success.

5. It was as if Dennis had started his own mini-company within the Company. As the department's only sales person, Dennis met with clients and project-managed all of his employees' jobs. Dennis's ADHD actually helped him in this role. He became excellent at multi-tasking and, with the help of his medication; he was able to work quickly in emergency situations.

6. During his time there, Dennis received several awards for his work. He consistently exceeded expectations and hit every sales goal, no matter how lofty. Additionally, he was well-respected by his clients and was part of every major sales project.

7. In 2013, upper management told Dennis that if he wanted to continue to grow within the Company, he would eventually need to relocate. He had hoped to have a long career at the Company and took their words to heart.

8. On April 1, 2014, Dennis took the plunge and moved his family to Fort Mill, SC for his career. It was shortly thereafter that problems arose.

3

### A. First Signs of Trouble.

9. When Dennis was hired, he signed a contract with the Company that promised, in addition to his base salary, a 10% commission, along with health benefits and insurance. Unfortunately, after relocating his family in September 2014 he learned that this simply was not the case. Rather than receiving the full 10% commission, the Company forced Dennis to split it with several other sales employees. Those same sales employees were not required to split their commission.

10. Furthermore, Dennis discovered that his insurance coverage and benefits package were not set up properly and that his overall pay was significantly less than that which he had been receiving prior to his move. Dennis did not discover that his insurance and benefits package were ineffective until he was turned down at a doctor's office after attempting to fill a prescription for his ADHD medication.

11. Dennis turned to General Manager Ron Campbell after discovering these problems. He spoke to Mr. Campbell on three separate occasions regarding the insurance and benefits package: once in May 2015, once in late June 2015, and once again in late July 2015. Regrettably, Dennis's complaints fell on deaf ears.

12. After receiving little to no response from Mr. Campbell, Dennis inquired a fourth time in September 2015 and was told that "everything was fine" and that Mr. Campbell "didn't see any issues." This was a huge problem for Dennis as he depended on his ADHD medication and was unable to pay for it out of pocket. This forced Dennis to progressively wean himself off the medication, causing him to go into withdrawals.

4

13. Dennis asked Mr. Campbell several more times whether or not the Company had been able to to take a look at and fix his insurance and benefits package, but nothing was ever done. During these conversations, Dennis consistently references his disability.

**B. Things Take a Turn for the Worst.**

14. On or around October 1, 2014, Dennis decided to take his problems to Human Resources Representative Tricia Wolfe. Unfortunately for Dennis, this was the beginning of the end with the Company.

15. Although Dennis told Ms. Wolfe that he had followed the insurance procedures correctly, she was adamant in telling Dennis that he had not followed them Ms. Wolfe told Dennis that until he did so there was nothing that she could do.

16. Exasperated, Dennis told Ms. Wolfe that he was "killing himself at work," meaning that he was working incredibly hard and, nonetheless, was still having problems with his insurance and medication. Ms. Wolfe immediately, and upon information and belief, disingenuously, viewed his statement as suicidal in nature.

17. That evening, police showed up at Dennis's house. They told him that Ms. Wolfe had reported that he was going to kill himself and that they were following up to ensure that he was okay. Dennis was absolutely horrified that anyone could think that he would harm himself or others. For Dennis, life was very precious and he strived every day to live life to the fullest, despite the setbacks. He tried to explain the situation and stated that Ms. Wolfe had misunderstood his earlier comment. He reiterated the fact that he was not going to hurt himself or others in any way.

18. Shortly after the discussion with Ms. Wolfe, the Company employed armed security guards at each individual location to "look out for Dennis" and to protect the employees.

### C. The Company Forces Dennis to Make Psychologist Visits.

19. On or around October 3, 2014, the Company forced Dennis to speak with a psychologist about his mental state. Despite a positive review from the psychologist stating that there was nothing wrong with Dennis and that he could return to work, the Company, specifically Ms. Wolfe, refused to allow to him come back. Ms. Wolfe previously disclosed to Dennis that she had a background in psychology, though she was not a licensed psychologist. Ms. Wolfe's bias towards Dennis's perceived disability interfered to the point that she disregarded an actual expert's advice.

20. Ms. Wolfe emailed Dennis telling him not to return to work and that he should file for short-term disability. This mandatory leave of absence turned into administrative leave, and the problems surrounding his medication only worsened.

21. In November 2014, the Company forced Dennis to see yet another psychologist. Once again, the psychologist concluded that nothing was wrong with him and that he was able to return to work. Again, the Company felt that this was an unsatisfactory determination. A second medical expert's opinion was insufficient.

### D. The Company Finally Allows Dennis to Return.

22. On or around January 12, 2015, the Company finally allowed Dennis to return to work. To his relief, his benefits and insurance had finally been straightened out, but the dark cloud created by Ms. Wolfe's response to his initial problems loomed large over his head. Indeed, Ms. Wolfe told Dennis that the only reason he was allowed to come back was because he was a

6

"lean, mean selling machine." Otherwise, she wouldn't have allowed it. This biased admission stunned Dennis.

23. In addition, Mr. Campbell and Ms. Wolfe wanted Dennis to sign a document to confirm that he would not speak ill of the Company or its leadership. The document read that if Dennis said anything he would be terminated immediately. Feeling as though he was being backed into a corner, Dennis decided it would be in his best interests not to sign it.

24. Over the next few months, Dennis exceeded expectations with regards to his sales, and did not encounter any performance issues. He headed the largest project that the Company ever had, and gained admiration from his superiors. Unfortunately, his good fortune ended there.

25. The rumor mill circulated amongst his co-workers, including those in Kansas and on to some of his existing clients, which inevitable caused them to lose their trust in him. In addition, other employees around the office made reference to the alleged suicidal comment and his leave of absence. Somehow, everyone knew the private details of Dennis's conversation with Ms. Wolfe and her response, regardless of how misguided it was. Dennis reported this to Mr. Campbell, who assured Dennis that it would be taken care of.

26. Dennis discovered that a poster had been placed at one of the factories with his face on it and a disclaimer, "if you see this man, call security immediately." In addition, he was told that bulletproof glass had been installed in one of the remodeled offices, just in case Dennis decided to "go off." Hurt and discouraged, Dennis tried his best to ignore these comments and push forward. He reported the issues to Mr. Campbell who responded that Dennis should just develop a "thicker skin."

7

27. Dennis had to consistently reassure his co-workers that he was not suicidal and that he did not want to harm anyone within the Company. Although the rumors continued to circulate, Mr. Campbell told Dennis that he did his best to squash them.

28. Things finally came to a head on June 5, 2015, when the Company terminated Dennis's employment. The HR Department was adamant that Dennis had to go. To make matters worse, security had been called upon his exit, and he was escorted out of the factory by an armed guard.

29. Dennis was not given a reason for his sudden termination, but later learned that Ms. Wolfe, along with another HR employee, conducted an investigation after an employee allegedly reported that Dennis made him or her uncomfortable. Dennis was never interviewed in relation to this alleged complaint, let alone written up, coached or warned. In fact, there are concerns as to whether the investigation actually occurred or was carried out in good faith.

30. It appears that Ms. Wolfe's bias towards Dennis's real or perceived disability, or retaliation for his leave or complaints, drove the Company's actions.

## IV. LEGAL CLAIMS

### Plaintiff's First Cause of Action
*(Wrongful Discharge in Violation of Public Policy Against Disability Discrimination)*

31. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

32. Plaintiff was an at will employee of Defendant.

33. Defendant employed at least 15 employees at all relevant times.

34. The public policy of North Carolina, codified in the North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143-422.2(a), seeks to protect and safeguard the opportunity and right of all individuals to "seek, obtain, and hold employment without discrimination" on the basis of disability or "handicap."

35. The public policy of the State of North Carolina, as set forth in N.C.G.S. § 168A, *et seq.*, North Carolina's Persons with Disabilities Protection Act, also prohibits employers from discriminating against employees on the basis of their disability.

36. Defendant violated this public policy by terminating Plaintiff on the basis of his actual or perceived disability and/or handicap after Plaintiff expressed concerns over his insurance and benefits packaged and notified Defendant that he suffered from ADHD. Plaintiff qualified as an individual with a handicap in that he was actually handicapped, had a record of being handicapped, and was perceived as such. Separate and apart from the disclosed ADHD, which qualifies, Defendant certainly perceived him as disabled or handicapped after it forced him to take a mental health leave and, subsequently, refused to let him return to work. This employer conduct has the tendency to be injurious to the public policy of North Carolina and is against the public good.

37. As a proximate result of Defendant's conduct, Plaintiff has suffered lost income, emotional distress, anxiety, humiliation, expenses, and other damages and is entitled to recover compensatory damages in an amount sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

38. Defendant's actions were done maliciously, willfully, wantonly, or in a manner that demonstrates a reckless disregard for Plaintiff's rights. As a result of Defendant's conduct,

Plaintiff is entitled to recover punitive damages in an amount sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

## Plaintiff's Second Cause of Action
### *(Violations of the Americans with Disabilities Act)*

39. The foregoing allegations are incorporated by reference herein.

40. Defendant regularly employed more than 15 employees at all relevant times.

41. Plaintiff was disabled in that without his medication, he had mental impairments that substantially limited one or more major life activities including, but not limited to: his mental processing, memory, sleeping, ability to work, concentrating, organizing thoughts, focusing, avoiding distractions, and remembering things. His disorder also substantially affected his interpersonal skills, making it more difficult to communicate with others. This disorder is the result of genetics and Plaintiff has lived with ADHD since he was a young child.

42. Plaintiff also had a record of these impairments.

43. Defendant otherwise perceived him as disabled at the time of Plaintiff's termination and in the lead up to Plaintiff's termination. This applies to both Plaintiff's ADHD and real or perceived anxiety or depression. Defendant perceived Plaintiff as so mentally disabled that it would not let him return to work even after he had been cleared by at least two psychologists. It also called police to his house, and allegedly believed he was suicidal.

44. Plaintiff's impairments were not transient and his inability to obtain medication worsened the effects.

45. Plaintiff was qualified for his position and could perform the essential functions of his job at all relevant times.

46. Plaintiff suffered an adverse employment action when Defendant placed Plaintiff on administrative leave, despite two positive psychologist evaluations indicating that Plaintiff was not a danger to himself or anyone else.

47. Plaintiff also suffered an adverse action when Defendant released his private medical information to co-workers and customers without Plaintiff's consent.

48. Plaintiff further suffered an additional adverse employment action when Defendant terminated Plaintiff subsequent to a cursory investigation in connection with Plaintiff's ADHD and Defendant's perception of Plaintiff's disabilities.

49. Defendant violated the ADA by treating Plaintiff differently than his peers in the terms and conditions of employment and ultimately terminating him on the basis of his actual or perceived disability.

50. Defendant also violated the ADA by retaliating against, and ultimately terminating, Plaintiff for engaging in protected activity, which included, but was not limited to, Plaintiff's opposition to Defendant's disparate treatment towards him on the basis of his real or perceived disability.

51. As a proximate and foreseeable result of Defendant's actions, Plaintiff has suffered severe emotional distress, severe mental distress and anxiety, depression, embarrassment, humiliation, and other compensatory damages in an amount in sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

11

Case 3:16-cv-00739-RJC-DCK   Document 1-1   Filed 10/26/16   Page 12 of 14

52. Defendant's actions were done maliciously, willfully, wantonly, or in a manner that demonstrates a reckless disregard for Plaintiff's rights. As a result of Defendant's conduct, Plaintiff is entitled to recover punitive damages in sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

### JURY TRIAL DEMANDED

WHEREFORE, the Plaintiff prays the Court to:

1. Enter a judgment against Defendant and order Defendant to pay Plaintiff compensatory damages in excess of an amount sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C.G.S. § 7A-243 and punitive damage

2. Award Plaintiff all reasonable costs and attorneys' fees incurred in connection with this action;

3. Award Plaintiff such other and further equitable relief as the Court deems appropriate under the circumstances;

4. Award Plaintiff punitive damages; and

5. Grant Plaintiff a trial of this matter by a jury.

This the 8th day of September, 2016.

_____
Sean F. Herrmann (NC Bar No. 44453)
sean@vankampenlaw.com
Van Kampen Law, PC
315 East Worthington Avenue
Charlotte, North Carolina 28203
Phone: (704) 247-3245
Fax: (704) 749-2638
*Attorney for Plaintiff*